**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ———————————————————— x | |
| Lauren Timmerman, individually and on behalf of all others similarly situated, : : | |
| : | Case No. |
| Plaintiff, : | |
| v. : | |
| : | |
| Global Product Management, Inc. and Dish Direct, Inc., : | **CLASS ACTION COMPLAINT** |
| : | |
| Defendants. : | **JURY TRIAL DEMANDED** |
| : | |
| : | |
| ———————————————————— x | |

Plaintiff, Lauren Timmerman (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by her attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

### NATURE OF THE ACTION

1.      This action seeks to remedy the deceptive and misleading business practices of Global Product Management, Inc. and Dish Direct, Inc. (hereinafter "Defendants") with respect to the marketing and sales of Defendants Global Product Management, Inc. and Dish Direct, Inc.'s Alteril products throughout the state of New York and throughout the country.  The Alteril products include the following (hereinafter the "Products"):

- Alteril All Natural Sleep Aid Tablets;

- Alteril Natural Sleep Aid Tablets;

- Alteril Fast Acting Softgels Natural Sleep Aid;

1

- Alteril PM With Tumeric Natural Sleep Aid.

2. Defendants manufacture, sell, and distribute the Products using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers, i.e., that their Products are "Natural" and/or "All Natural;" however, Defendants' advertising and marketing campaign is false, deceptive, and misleading because the Products contain non-natural, synthetic ingredients.

3. Plaintiff and those similarly situated ("Class Members") relied on Defendants' misrepresentations that the Products are "Natural" and/or "All Natural" when purchasing the Products. Plaintiff and Class Members paid a premium for the Products based upon their "Natural" and/or "All Natural" representation. Given that Plaintiff and Class Members paid a premium for the Products based on Defendants' misrepresentations that they are natural, Plaintiff and Class Members suffered an injury in the amount of the premium paid.

4. Defendants' conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350. Defendants breached and continue to breach their warranties regarding the Products. Accordingly, Plaintiff brings this action against Defendants on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## FACTUAL BACKGROUND

5. Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in food, cleaning products, bath and beauty products and everyday household products. Companies such as Defendants have capitalized on consumers' desire for purportedly

2

"natural products."  Indeed, consumers are willing to pay, and have paid, a premium for products branded "natural" over products that contain synthetic ingredients.  In 2015, sales of natural products grew 9.5% to $180 billion.[1]  Reasonable consumers, including Plaintiff and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

6.      Despite the Products containing a number of synthetic ingredients, Defendants markets the Products as "Natural" and/or "All Natural."  The Products' labeling is depicted below:

---

[1] *Natural Products Industry Sales up 9.5% to $180bn Says NBJ,* FOOD NAVIGATOR, http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6; *see also*  Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www.investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025); *Natural living: The next frontier for growth? [NEXT Forecast 2017]*, NEW HOPE NTWORK (December 20, 2016), http://www.newhope.com/beauty-and-lifestyle/natural-living-next-frontier-growth-next-forecast-2017.

**Alteril All Natural Sleep Aid Tablets**



**Synthetic Ingredients:**

Sorbitol
Calcium Carbonate
Dicalcium Phosphate
Titanium Dioxide
Riboflavin
Magnesium Stearate
Stearic Acid
Silicon Dioxide

4

**Alteril Natural Sleep Aid Tablets**



**Synthetic Ingredients:**

Sorbitol
Calcium Carbonate
Dicalcium Phosphate
Magnesium Stearate
Stearic Acid
Silicon Dioxide
Maltodextrin
Dextrin
Titanium Dioxide
Riboflavin

**Alteril Fast Acting Softgels Natural Sleep Aid**



**Synthetic Ingredients:**

Gelatin
Glycerin
Titanium Dioxide
Maltodextrin
Dextrin
Silicon Dioxide

**Alteril PM With Tumeric Natural Sleep Aid**



**Synthetic Ingredients:**

Dicalcium Phosphate
Microcrystalline Cellulose
Stearic Acid
Magnesium Stearate
Silicon Dioxide
Maltodextrin
Glycerin

7.     Defendants' representations that the Products are natural, are false, misleading, and deceptive because the Products contain multiple ingredients that are, as explained below, synthetic.

    **a.** **Gelatin** is a synthetic ingredient that is commercially processed using hydrolysis. See 9 C.F.R. §94.20.

    **b.** **Maltodextrin** is recognized as a synthetic by federal regulations.  Maltodextrin is a saccharide polymer that is prepared as a white powder or concentrated solution by partial hydrolysis of corn starch, potato starch, or rice starch using acids and enzymes.  (72 Fed. Reg. 62149, 62166 (proposed Nov. 2, 2007); 21 C.F.R. § 184.1444).  Maltodextrin is primarily used as a carrier or bulking agent.  It is a synthetic factory-produced texturizer that is created by complex processing that does not occur in nature.  To produce maltodextrin, acids and/or enzymes are applied in sequence to a starch to produce partial hydrolysis (saccharification). The acids or enzymes convert or depolymerize starch to glucose or maltose molecules.  Once maltose is high enough for maltodextrin, the acids or enzymes are neutralized, removed, or deactivated.  (57 Fed. Reg. 23989 (proposed June 5, 1992)).  *See also Maltodextrins*, GMO Compass, Dec. 10, 2008, available at http://www.gmo-compass.org/eng/database/ingredients/148.maltodextrins.html

    **c.** **Riboflavin** (C17H20N4O6, CAS Reg. No. 83885) occurs as yellow to orange yellow needles that are crystallized from 2N acetic acid, alcohol, water, or pyridine.  It may be prepared by chemical synthesis, biosynthetically by the organism Eremothecium ashbyii, or isolated from natural sources.  21CFR §

184.1695.  Further, as set forth in 21 CFR § 73.450, riboflavin is a color additive. Riboflavin is synthetic.

d. **Microcrystalline Cellulose** is a chemically modified form of naturally occurring cellulose.  The hydrolysis process breaks the beta -1,4 glycosidic bonds causing a complete structural and functional change from its native form.  Therefore, it is classified as a synthetic additive.[2]

e. **Stearic Acid** is a mixture of variable proportions of glyceryl monostearate, glyceryl monopalmitate, and glyceryl esters of fatty acids present in commercial stearic acid.  It is recognized by federal regulations as synthetic.  *See* 7 C.F.R. § 205.605(b).

f. **Silicon Dioxide** is an anticaking agent.  *See* 21 C.F.R. § 172.480.

g. **Sorbitol** is a type of sugar alcohol used as a thickener and a skin conditioning agent.[3]

h. **Magnesium Stearate** is the magnesium salt of stearic acid.  It is produced as a white precipitate by the addition of an aqueous solution of magnesium chloride to an aqueous solution of sodium stearate derived from stearic acid.  *See* 21 CFR § 184.1440.  Stearic acid occurs naturally as a glyceride in tallow and other animal or vegetable fats and oils and is a principal constituent of most commercially hydrogenated fats.  It is produced commercially from hydrolyzed tallow derived

---

[2] https://foodadditives.net/anticaking-agent/microcrystalline-cellulose/
[3] http://www.ewg.org/skindeep/ingredient/706239/SORBITOL/

from edible sources or from hydrolyzed, completely hydrogenated vegetable oil derived from edible sources, and is therefore a synthetic. *See* 21 CFR § 184.1090.

i.   **Calcium Carbonate** is synthetic. It is produced from calcium hydroxide, calcium chloride, or as a byproduct in the lime soda process. Federal regulations recognize calcium hydroxide as a synthetic compound (and the FDA has declared that calcium chloride renders a food no longer "natural.")[4] The lime soda process employs hazardous and synthetic substances and requires processing techniques so excessive so as to render the finished product unnatural. In fact, the EPA has promulgated regulations specifically addressing the environmental impact of calcium carbonate produced through the lime process and by recovery from the Solvay waste products. Additionally, when used in drugs, calcium carbonate is listed as a synthetic compound by federal regulation.

j.   **Dicalcium Phosphate** is derived from bovines by precipitating the phosphate extracted from a very high grade of bone by the use of high-grade chemical lime.[5] It is a recognized synthetic chemical under federal regulations. *See* 7 C.F.R. §205.605(b).

k.   **Titanium Dioxide** is a color additive that is synthetically prepared Ti02, free from admixture with other substances.[6]

l.   **Dextrin**, which is created from starch using hydrochloric acid and enzymes in

---

[4] *See* FDA Warning Letter to Karl A. Hirzel, Hirzel Canning Co., (Aug. 29, 2001).
[5] https://kb.osu.edu/dspace/bitstream/handle/1811/60894/OARDC_bulletin_n455.pdf?sequence=1
[6] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=73.575

multi-stage chemical process, is not a natural ingredient. On May 14, 2020, the National Advertising Division ("NAD") issued a ruling **(Exhibit A)** concluding that the dextrin in prebiotic fiber supplements was not "natural." NAD reached this conclusion by reviewing the complex chemical process used to produce the dextrin. The process begins with starch, a carbohydrate derived from wheat. Hydrochloric acid is added to the starch and the starch is then heated to a high temperature, which creates new bonds between the glucose sugars. Next, an enzyme, α-amylase, is added to the mixture, which further reduces the molecular weight of the polymer chains. After the enzyme is added, the preferred polymers are selected, collected from the mixture, filtered to remove impurities, then concentrated to remove water and increase the concentration of polysaccharides to transform the solution into a dry powder. Then, the substance is subjected to chromatography which allows the manufacture to select specific polysaccharides by molecular weight to alter the weight distribution of the mixture and allows for the removal of small sugar molecules, which further increases the fiber content of the mixture. Finally, the product is purified by ion exchange, evaporated and then spray dried to product the final starch ingredient. As NAD noted, this process "transforms the source ingredient – starch – which is digestible and has 0% dietary fiber, into a new ingredient – dextrin – which is non-digestible and has 85% dietary fiber." Upon consideration of the chemical process used to create dextrin, NAD concluded that reasonable consumers would not consider prebiotic fiber

11

supplements with dextrin to be natural because "ingredients that are derived from nature and undergo significant chemical alterations are often not 'natural' in the way that consumers expect them to be."

**m. Glycerin** is a factory-produced texturizer that is created by complex processing. It is recognized by federal regulations as synthetic. *See* 7 C.F.R. § 205.605(b). It is commonly used as a filler and thickening agent. It requires multiple processing steps in an industrial environment to create glycerin, and therefore it cannot be described as "natural." A technical evaluation report compiled by the USDA AMS Agricultural Analytics Division for the USDA National Organic Program explains that glycerin is "produced by a hydrolysis of fats and oils" and is listed in the USDA Organic Program's National List as a "synthetic nonagricultural (nonorganic) substance." The same report lists several methods of producing glycerin, each of which involve numerous steps that include the use of high temperatures, pressure, and purification to get an end product.

| Processes for producing glycerin by hydrolysis of fats and oils[7] | |
|---|---|
| Lemmens Fryer's Process | Oil or fat is subjected in an autoclave to the conjoint action of heat and pressure (about 100 PSI) in the presence of an emulsifying and accelerating agent, e.g. zinc oxide or hydroxide (sodium hydroxide can be substituted) for about eight hours. The strong solution of glycerin formed is withdrawn and replaced by a quantity of hot, clean, and preferably distilled water equal to about one third to one fourth of the weight of the original charge of oil or fat and treatment continued for an additional four hours. The dilute glycerin obtained from the latter part of the process is drawn off |

---

[7] https://www.ams.usda.gov/sites/default/files/media/Glycerin%20Petition%20to%20remove%20TR%202013.pdf

| | and used for the initial treatment of the further charge of oil or fat. |
|---|---|
| Budde and Robertson's Process | The oils or fats are heated and mechanically agitated with water and sulphuric acid gas, under pressure in a closed vessel or autoclave. The advantage claimed for the process are that the contents of the vessel are free from foreign matter introduced by reagents and need no purification; that the liberated glycerin is in the form of a pure and concentrated solution; that no permanent emulsion is formed and that the fatty acids are not discolored. |
| Ittner's Process | Coconut oil is kept in an autoclave in the presence of water at 70 atmospheres pressure and 225-245oC temperature and split into fatty acids and glycerin, both being soluble under these conditions in water. The glycerin solution separates in the bottom of the autoclave. The aqueous solution contains at the end of the splitting process more than 30 percent glycerin. |
| Continuous High-Pressure Hydrolysis | In this process a constant flow of fat is maintained flowing upward through an autoclave column tower against a downward counterflow of water at a pressure of 600 PSI maintained at temperature of 480-495oF. Under these conditions, the fat is almost completely miscible in water and the hydrolysis take place in a very short time. The liberated fatty acids, washed free of glycerin by the downward percolating water, leave the top of the column and pass through a flash tank while the liberated glycerin dissolves in the downward flow of water and is discharged from the bottom of the tower into the sweet-water storage tank. |

8.      Whether Defendants' labeling of the Products as natural is deceptive is judged by whether it would deceive or mislead a reasonable person.  To assist in ascertaining what a reasonable consumer believes the term natural means, one can look to the regulatory agencies for their guidance.

9.      In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic (Natural).  In accordance with this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is

13

manufactured, produced, or extracted from a natural source (i.e. naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e. a process whereby a substance is transformed into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter. **(Exhibit B).**

10. Congress has defined "synthetic" to mean "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plants, animals, or mineral sources . . . ." 7 U.S.C. § 6502 (21).

11. Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale. Consumers would not know the true nature of the ingredients merely by reading the ingredients label.

12. Discovering that the ingredients are not natural and are actually synthetic requires a scientific investigation and knowledge of chemistry beyond that of the average consumer. This is why, even though the ingredients listed above are identified on the back of the Products' packaging in the ingredients listed, the reasonable consumer would not understand – nor are they expected to understand - that these ingredients are synthetic.

13. Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Defendants' prominent claims, representations, and warranties that the Products are natural.

14

14.    Defendants did not disclose that the above listed ingredients are synthetic ingredients.    A reasonable consumer understands Defendants' "Natural" and/or "All Natural" claims to mean that the Products are natural and do not contain synthetic ingredients.

15.    Defendants have thus violated, *inter alia*,  NY General Business Law § 392-b by: a) putting upon an article of merchandise, bottle, wrapper, package, label, or other thing containing or covering such an article, or with which such an article is intended to be sold, or is sold, a false description or other indication of or respecting the kind of such article or any part thereof; and b) selling or offering for sale an article which, to its knowledge, is falsely described or indicated upon any such package or vessel containing the same, or label thereupon, in any of the particulars specified.

16.    Consumers rely on label representations and information in making purchasing decisions.

17.    The marketing of the Products as "Natural" and/or "All Natural" in a prominent location on the labels of all of the Products, throughout the Class Period, evidences Defendants' awareness that natural claims are material to consumers.

18.    Defendants' deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

19.    Plaintiff and the Class Members reasonably relied to their detriment on Defendants' misleading representations and omissions.

20.     Defendants' false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

21.     In making the false, misleading, and deceptive representations and omissions described herein, Defendants knew and intended that consumers would pay a premium for Products labeled as being "Natural" and/or "All Natural" over comparable products not so labeled.

22.     As an immediate, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants injured Plaintiff and the Class Members in that they:

> **a.**     Paid a sum of money for Products that were not what Defendants represented;
>
> **b.**     Paid a premium price for Products that were not what Defendant srepresented;
>
> **c.**     Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendants warranted;
>
> **d.**     Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendants represented;
>
> **e.**     Ingested a substance that was of a different quality than what Defendants promised; and
>
> **f.**     Were denied the benefit of the beneficial properties of the natural supplement Defendants promised.

23.     Had Defendants not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased.

24.     Plaintiff and the Class Members paid for Products that are natural but received Products that are not natural.  The Products Plaintiff and the Class Members received were worth less than the Products for which they paid.

25.     Plaintiff and the Class Members all paid money for the Products; however, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendants' misrepresentations and omissions.  Plaintiff and the Class Members purchased, purchased more of, and/or paid more for the Products than they would have had they known the truth about the Products.  Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendants' wrongful conduct.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section 1332(d) in that: (1) this is a class action involving more than 100 class members; (2) Plaintiff is a citizen of the state of New York, Defendant Global Product Management, Inc. is a citizen of the state of California, and Defendant Dish Direct, Inc. is a citizen of the states of California and Florida; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

27.     This Court has personal jurisdiction over Defendants because Defendants conduct and transact business in the state of New York, contract to supply goods within the state of New York, and supply goods within the state of New York.

17

28.    Venue is proper because Plaintiff and many Class Members reside in the Eastern District of New York, and throughout the state of New York.  A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

## PARTIES

### Plaintiff

29.    Plaintiff is an individual consumer who, at all times material hereto, was a citizen of New York State.  Plaintiff purchased the Products during the Class Period.  Plaintiff purchased Defendant's Alteril All Natural Sleep Aid for her personal use in 2022 for a purchase price of $19.98 on Amazon.com.  Plaintiff purchased the Product in the state of New York and had the product shipped to her home in the state of New York.  The Product purchased by the Plaintiff is substantially and sufficiently similar to the Products that Plaintiff did not purchase (i.e. each of Defendant's Products set forth herein in paragraph 1)

30.    The packaging of the Products Plaintiff purchased contained the representation that they were "Natural" and/or "All Natural."   Plaintiff believes that products that are labeled as natural do not contain synthetic ingredients.  Plaintiff believes a synthetic ingredient is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources.  If the Products actually were natural, as represented on the Products' label, Plaintiff would purchase the Products in the immediate future.

31.    Had Defendant not made the false, misleading, and deceptive representation that the Products were natural, Plaintiff would not have been willing to pay the same amount for the

18

Products, and, consequently, would not have been willing to purchase the Products. Plaintiff purchased, purchased more of, and/or paid more for, the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid. Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

**Defendants**

31.    Defendant Global Product Management, Inc. is a corporation with its principal place of business in Monrovia, California. Defendant manufactures, markets, advertises, and distributes the Products throughout the United States. Defendant created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling for the Products.

32.    Defendant Dish Direct, Inc. is a corporation with its principal place of business in Tampa, Florida. Defendant manufactures, markets, advertises, and distributes the Products throughout the United States. Defendant created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling for the Products.

## CLASS ALLEGATIONS

33.    Plaintiff brings this matter on behalf of herself and those similarly situated. As detailed at length in this Complaint, Defendants orchestrated deceptive marketing and labeling practices. Defendants' customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution.

34.    The Class is defined as all consumers who purchased the Products anywhere in the United States during the Class Period (the "Class").

35.     Plaintiff also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of New York at any time during the Class Period (the "New York Subclass").

36.     The Class and New York Subclass shall be referred to collectively throughout the Complaint as the Class.

37.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

38.     <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendants' deceptive and misleading practices.

39.     <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

    a.     Whether Defendants are responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

    b.     Whether Defendants' misconduct set forth in this Complaint demonstrates that Defendants have engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

    c.     Whether Defendants made false and/or misleading statements to the Class and the public concerning the contents of their Products;

20

     d.   Whether Defendants' false and misleading statements concerning their Products were likely to deceive the public; and

     e.   Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members?

40.   <u>Typicality</u>: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendants' Products.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

41.   <u>Adequacy</u>: Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the Class Members she seeks to represent, her consumer fraud claims are common to all members of the Class and she has a strong interest in vindicating her rights, she has retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

42.   <u>Predominance</u>: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class.  The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendants' deceptive and misleading marketing and labeling practices.

43.   <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a. The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b. The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

c. When Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d. This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f. This class action will assure uniformity of decisions among Class Members;

g. The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h. Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

     i.   It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by Defendants' uniform false advertising to purchase their Products as "Natural" and/or "All Natural."

44.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiff and New York Subclass Members)**

45.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

46.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

47.    The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the New York Subclass Members seek monetary damages against Defendants.

48.    There is no adequate remedy at law.

49.    Defendants misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

50. Defendants' improper consumer-oriented conduct—including labeling and advertising the Products as being "Natural" and/or "All Natural" —is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendants' Products and to use the Products when they otherwise would not have. Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

51. Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for products that were—contrary to Defendants' representations— not natural. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

52. Defendants' advertising and Products' packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Products and to pay a premium price for them.

53. Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

54. As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATION OF NEW YORK GBL § 350
### (On Behalf of Plaintiff and the New York Subclass Members)

57.    Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

58.    N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

59.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

60.    Defendants' labeling and advertisements contain untrue and materially misleading statements concerning Defendants' Products inasmuch as they misrepresent that the Products are "Natural" and/or "All Natural."

61.    Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which were—contrary to Defendants' representations—not natural.  Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

62.    Defendants' advertising, packaging, and Products' labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Products.

63.    Defendants made their untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

64.    Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

65.    Defendants made the material misrepresentations described in this Complaint in Defendants' advertising and on the Products' packaging and labeling.

66.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

67.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of Plaintiff and All Class Members)**

68.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.    Defendants provided Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products are "Natural" and/or "All Natural."

70.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

71.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiff's and Class Members' transactions.

72.    Plaintiff and Class Members reasonably relied upon Defendants' affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendants' Products.

73.    Within a reasonable time after she knew or should have known of Defendants' breach, Plaintiff, on behalf of herself and Class Members, placed Defendant on notice of their breach by mailing Defendants a pre-suit letter on June 9, 2022, giving Defendants an opportunity to cure their breach, which they refused to do.

74.    Defendants thereby breached the following state warranty laws:

a.    Code of Ala. § 7-2-313;

b.    Alaska Stat. § 45.02.313;

c.    A.R.S. § 47-2313;

d.    A.C.A. § 4-2-313;

e.    Cal. Comm. Code § 2313;

f.    Colo. Rev. Stat. § 4-2-313;

g.    Conn. Gen. Stat. § 42a-2-313;

h.    6 Del. C. § 2-313;

i.    D.C. Code § 28:2-313;

j.    Fla. Stat. § 672.313;

k.    O.C.G.A. § 11-2-313;

l.    H.R.S. § 490:2-313;

m.    Idaho Code § 28-2-313;

n.    810 I.L.C.S. 5/2-313;

o.    Ind. Code § 26-1-2-313;

p.    Iowa Code § 554.2313;

q.    K.S.A. § 84-2-313;

r.    K.R.S. § 355.2-313;

s.    11 M.R.S. § 2-313;

t.    Md. Commercial Law Code Ann. § 2-313;

u.    106 Mass. Gen. Laws Ann. § 2-313;

v.    M.C.L.S. § 440.2313;

w.    Minn. Stat. § 336.2-313;

x.    Miss. Code Ann. § 75-2-313;

y.    R.S. Mo. § 400.2-313;

z.    Mont. Code Anno. § 30-2-313;

aa.    Neb. Rev. Stat. § 2-313;

bb.     Nev. Rev. Stat. Ann. § 104.2313;

cc.     R.S.A. 382-A:2-313;

dd.     N.J. Stat. Ann. § 12A:2-313;

ee.     N.M. Stat. Ann. § 55-2-313;

ff.     N.Y. U.C.C. Law § 2-313;

gg.     N.C. Gen. Stat. § 25-2-313;

hh.     N.D. Cent. Code § 41-02-30;

ii.     II. O.R.C. Ann. § 1302.26;

jj.     12A Okl. St. § 2-313;

kk.     Or. Rev. Stat. § 72-3130;

ll.     13 Pa. Rev. Stat. § 72-3130;

mm.     R.I. Gen. Laws § 6A-2-313;

nn.     S.C. Code Ann. § 36-2-313;

oo.     S.D. Codified Laws, § 57A-2-313;

pp.     Tenn. Code Ann. § 47-2-313;

qq.     Tex. Bus. & Com. Code § 2.313;

rr.     Utah Code Ann. § 70A-2-313;

ss.     9A V.S.A. § 2-313;

tt.     Va. Code Ann. § 59.1-504.2;

uu.     Wash. Rev. Code Ann. § 6A.2-313;

vv.     W. Va. Code § 46-2-313;

ww.    Wis. Stat. § 402.313; and

xx.    Wyo. Stat. § 34.1-2-313.

75.    Defendants breached the express warranty because the Products are not "Natural" and/or "All Natural" because they contain synthetic ingredients.

76.    As a direct and proximate result of Defendants' breach of the express warranty, Plaintiff and Class Members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, prays for judgment as follows:

(a)  Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under Rule 23 of the FRCP;

(b)  Enjoining Defendants from continuing their unlawful practices described herein;

(c)  Awarding monetary damages and treble damages;

(d)  Awarding statutory damages of $50 per transaction, and treble damages for knowing and willful violations, pursuant to N.Y. GBL § 349;

(e)  Awarding statutory damages of $500 per transaction pursuant to N.Y. GBL § 350;

(f)  Awarding punitive damages;

(g)  Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and

reimbursement of Plaintiff's expenses; and

(h) Granting such other and further relief as the Court may deem just and proper.


Dated: February 9, 2023

**THE SULTZER LAW GROUP P.C.**

Jason P. Sultzer /s/

By: _____

Jason P. Sultzer, Esq.
Daniel Markowitz, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

*Counsel for Plaintiff and the Class*